BIMEX CORPORATION, Plaintiff-Appellee, v. ELITE PLASTIC SERVICES, INC., Defendant-Appellant.
First District (1st Division)   No. 1—89—1308

Opinion filed June 25, 1990.

Schwartz & Freeman and Walter Soroka, both of Chicago (Lawrence Jay Weiner, of counsel), for appellant.

Bell, Boyd & Lloyd, of Chicago (Eric J. Avram, of counsel), for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

Bimex Corporation (Bimex) sued Elite Plastic Services, Inc. (Elite), for amounts owed for the purchase of metallurgical products manufactured by Bimex. Elite asserted as an affirmative defense that breach of warranties by Bimex with respect to one product had caused Elite to incur greater costs than the amount owed to Bimex.

After a bench trial, the trial court entered judgment for Bimex, ruling that Elite failed to establish either warranties or breach. For the reasons below, we affirm.

Extrusion and injection molding are manufacturing processes where fluid material, such as plastics, is forced into a mold through a nozzle, or barrel. To protect the barrel from wear, it is fitted with a replaceable bimetal liner, such as the QC 9100, made by Bimex. Bimex makes other metallurgical products and sells its products to manufacturers through distributors, such as Elite, which either resells to the ultimate user, or tools the Bimex products into its own products.

In 1984, Donald Lomax, president of Bimex, and Edward Blechner, president of Elite, met to discuss an arrangement for Bimex to sell QC 9100 liners to Elite. Blechner told Lomax that Elite had a very important customer and was interested in using Bimex's products. Lomax told Blechner that the QC 9100 liner was "just as good as" other liners used by the industry.

In December 1984, Bimex shipped a QC 9100 to Elite, which fitted the liner into a barrel. The fitting process required splitting the liner, sizing it for the particular barrel, and welding it, all of which was done by Elite. Elite then sold the barrel to J-M Manufacturing Company (JM), not a party here.

JM used Elite's barrel for just 34 hours, then returned it to Elite due to excessive wear in the liner. Elite notified Bimex, and two Bimex employees went to Elite to inspect the liner. Bimex sent a replacement QC 9100 liner to Elite, but JM refused to accept the barrel with the replacement. JM required Elite to reline the barrel at no cost to JM, with a liner by a different manufacturer. The replacement liner was returned to Bimex, but the original was not.

On July 2, 1985, Elite notified Bimex of JM's refusal to accept the replacement QC 9100, and stated that Elite would deduct the relining costs from the amount owed Bimex. Bimex disclaimed any liability for the relining costs.

On April 16, 1986, Bimex sued to collect the amount owed by Elite. Elite asserted, as an affirmative defense, that Bimex had breached implied and express warranties with respect to the QC 9100, causing Elite to incur costs exceeding the amount it owed Bimex.

At trial, Lomax and Blechner testified to the above events. The Bimex employees who inspected the original liner after it was returned by JM did not testify. Blechner also testified that tests on the original liner after its return showed that its hardness was far below industry standards.

The trial court found that although Blechner might have told Lo-

max at their meeting that JM was the ultimate user, Lomax was not informed that Elite intended to rework the liner into its own barrel. The trial court further found that Blechner made unreasonable assumptions based on Lomax's assertion that the QC 9100 was "just as good as" other liners used in the industry, and that those assumptions were insufficient to establish any express warranties, absent a showing that the parties intended to incorporate the assumptions into the purchase contract.

The trial court ruled that Bimex had made no warranties, express or implied, concerning the quality of the QC 9100, or its fitness for a particular purpose. The trial court further ruled that Elite had failed to establish that the failure of the QC 9100 liner was due to its defective manufacture. Accordingly, the trial court entered judgment for Bimex. Elite appeals.

Elite argues that the trial court erroneously disregarded evidence that the QC 9100 was defective and that its rulings were contrary to the manifest weight of the evidence. The trial court's rulings, however, were correct.

Elite argues that Blechner's testimony concerning the hardness of the QC 9100, and Bimex's failure to call the employees, required the trial court to rule, as a matter of law, that Bimex breached its warranties with respect to the QC 9100. Elite's contentions are based on correct legal principles: undisputed testimony binds the trier of fact, and the failure to call witnesses unavailable to the adverse party raises the presumption that their testimony would be adverse. The conclusions Elite draws from those contentions, however, are without merit.

The trial court stated that it disregarded testimony concerning defects in the QC 9100 because Elite had failed to establish that Bimex made any warranties of quality or fitness. Even had Blechner's testimony been accepted without qualification, and the Bimex employees testified that the QC 9100 was defective, neither testimony would have established that Bimex had made any warranties. The trial court correctly disregarded the evidence.

■ ■ Elite also argues that the trial court's rulings were contrary to the manifest weight of the evidence, but the record supports the trial court. The Uniform Commercial Code (Ill. Rev. Stat. 1987, ch. 26, par. 1—101 *et seq.*) provides:

> "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or

modified under the next section an implied warranty that the goods shall be fit for such purpose." (Ill. Rev. Stat. 1987, ch. 26, par. 2—315.)

The Commercial Code further provides:

"(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model." Ill. Rev. Stat. 1987, ch. 26, par. 2—313.

■ The record shows that Blechner did not inform Lomax at their meeting that Elite required the QC 9100 for a particular application, and that Bimex had no knowledge of a particular requirement by Elite when the invoice for the original QC 9100 was sent. Elite contends that Bimex "probably knew," by the time the original QC 9100 was shipped, that Elite intended to rework the liner into a barrel for JM, but even had Bimex known then of Elite's intended use, the shipping occurred after the contract had been made. Clearly, Bimex knew of no particular requirement by Elite at the time the parties contracted for the sale and purchase of the QC 9100. The record further shows that, even assuming Lomax's assertion that the QC 9100 was "just as good as" other liners was a promise or affirmation of fact, and not simply "puffing," or opinion, the assertion was not made part of the contract for the QC 9100. Thus, the record supported the trial court's ruling that Bimex gave no warranties, express or implied, concerning the quality of the QC 9100 or its fitness for a particular purpose.

■ Finally, the trial court correctly found that Elite failed to show that the failure of its barrel was due solely to breach of warranties. The record shows that the liner failed after undergoing Elite's reworking process, and Elite offered no evidence to show that the failure of its barrel was caused by defective manufacture of the QC 9100, and not substantial alterations made in the reworking process. Thus, even assuming, *arguendo*, that Bimex made warranties, Elite failed to show that the warranties had been breached.

In conclusion, the record supports the trial court's findings that

Elite failed to establish that Bimex had made any warranties, express or implied, for the fitness of the QC 9100 liner for a specific purpose, and that Elite failed to show that any failure of the liner was the result of defective manufacture. Elite's arguments fail to show that the trial court's rulings were clearly erroneous. Accordingly, we affirm.

Affirmed.

BUCKLEY, P.J., and CAMPBELL, J., concur.